# PICKFORD v. TALBOTT.*

---

LIBEL; EVIDENCE; COURT AND COUNSEL; OBJECTIONS; CHARGE TO JURY.

1. Evidence tending to show the truth of alleged libelous words is inadmissible under the general issue, either in bar of the action or in mitigation of damages.

2. It is the duty of counsel, if the trial court, in stopping a proposed line

---

*Libel and Slander—Truth as Defense—Pleading.*—In a note in Lawyers Reports Annotated (21 L.R.A. 502) the authorities dealing with the ques-

of inquiry in the cross-examination of a witness, is under a misapprehension as to the purpose of such line of inquiry, to correct such misapprehension by a specific statement of the questions he desires to ask, or of the particular facts concerning which he proposes to inquire.

3. Where the charge to the jury embodied all that is contained in a refused instruction, the denial of the instruction is not error.

4. A charge to the jury in a libel case is correct which in effect states that one who procures the publication of a newspaper article libelous *per se,* or the circulation of copies of a newspaper containing such an article, is liable to the person defamed, no matter who wrote the article; and that a principal is responsible for a libelous newspaper article written by his agent, if the agent's general authority was such as fairly carried with it the authority to express in the principal's behalf what the article contains.

No. 1698.  Submitted October 19, 1906.  Decided December 14, 1906.

HEARING on an appeal by the defendants from a judgment on verdict of the Supreme Court of the District of Columbia in an action of libel.                                   *Affirmed.*

The COURT in the opinion stated the facts as follows:

This is an appeal from a judgment for $8,500 recovered by the plaintiff in an action for libel.

The declaration of the plaintiff, Henry M. Talbott, is in three counts.  The first alleged that on and before December 7, 1901, plaintiff was state's attorney for Montgomery county, in the State of Maryland, and had been elected to said office by the voters of said county.  That as such officer it was his duty to conduct the prosecution of all persons accused of crimes com-

tions involved in this defense, together with the necessity and mode of pleading the same, are presented.

*Libel and Slander—Responsibility for Acts Committed by Another.*— Various phases of this subject are treated and the authorities presented in the following notes in the Lawyers Reports Annotated: Criminal liability for agent's acts, 41 L.R.A. 653; Liability of officers of corporation for its libelous publications, 28 L.R.A. 427; Liability of newspaper proprietor for libel published without his knowledge or consent, 26 L.R.A. 779; Liability of husband and wife for wife's libel and slander, 30 L.R.A. 521.

mitted in said county, before the grand and petit juries thereof. That, well knowing plaintiff's good name and reputation as such officer, and with the intent to deprive him of the same, and bring him into scandal and disrepute among his neighbors and other citizens of Maryland, the defendants, Thomas H. Pickford and John H. Walter, on December 7, 1901, composed and published a libel concerning the plaintiff. The count set out certain parts of the publication. The second and third counts, in addition to the allegations of plaintiff's public position as aforesaid, alleged that he was a lawyer in good standing in the said county where he lived, and that the publication of the libel was made maliciously to destroy his good name and reputation both as a lawyer and as officer aforesaid. The alleged libelous article was alleged to have been printed in a newspaper published in the District of Columbia, and circulated therein and in Maryland, called the "Sunday Globe." It was set out in full in both counts. It is unnecessary to repeat it here, because it is not denied that it is libelous *per se,* and no exception was taken to the charge of the court wherein it was so characterized. It is sufficient to say that it purported to be a vindication of defendants and others who had been indicted in Montgomery county, Maryland, for the crime of arson, while plaintiff was State's attorney for said county, and accused him of combining with persons called "blackmailers" to procure a false indictment, and of otherwise acting improperly in the prosecution until compelled to dismiss the same, etc.

The defendants pleaded not guilty to each count, and issue was joined thereon.

Plaintiff offered one William J. Elliot as a witness, whose evidence was, substantially, that he published the Sunday Globe in 1901, a copy of which, dated December 8, 1901, he identified as containing the libelous article under the heading, "The History of a Crime." That Judge Thomas J. Mackey saw him about the case of defendants, and they came to the office and stated it. The judge said the article would create an excitement. Witness objected that it was libelous, which the judge said was true, but witness was willing to publish it for the

"public good." Pickford and Walter undertook to save witness harmless. They paid $50 or $100 for the publication, and $2 for a boy to take 500 papers to Rockville, Maryland, and distribute them. Pickford gave instructions for the boy to sell all he could and distribute the rest. Pickford and Walter were at the office five or six times; once together. Judge Mackey was with them once. Judge Mackey brought the manuscript of his article, blocked out in the rough, with a synopsis of the facts in it, or an epitome of the case. Have looked for this manuscript and cannot find it. On cross-examination, witness said he had known Mackey for some years; that Mackey brought him the article. Witness did not remember that it was headed, "Oppression under the Form of Law." It wasn't signed by Mackey. Did not publish as Mackey had written it. May have told him it was too technical,—too dry. Told him witness would rewrite or elaborate it. Did not remember Mackey's saying afterwards that he did not recognize it. May have told Mackey he had put "hot stuff" in it to make it readable. Printed another article on the following Sunday (December 15), the material for which was furnished by Pickford. (This second article, written by one Bradshaw, though frequently alluded to by witnesses, was not offered in evidence.)

Witness further said he did not say he put "hot stuff" in the first article. Mackey furnished the epitome written, and added to it in talk, and the whole was reproduced in the first article. The article was prepared during the week before publication. Mackey came alone first, and later with Pickford, when the conversation was general. Was not certain if it was the first or second article that the boy was to distribute. Changed the second article before printing. Got money from Pickford for both articles.

The copy of the Globe for December 8 was then produced, and the article read in evidence. The boy who distributed the papers at Rockville was unable to say whether it was on December 8 or 15. Plaintiff testified briefly as to his official position and profession on and before December 8, 1901, and to the fact that the Globe was circulated in Rockville, containing the

first publication, as he thought. One was left on his porch. He was cross-examined at great length relating to the finding of the indictment, his acquaintance and relations with the alleged blackmailers Hopp and Hudson, his knowledge of and presence at certain trials of cases against them. No objection was made on his part to the scope of this cross-examination; but the court finally terminated it, as will hereafter appear.

The witness Elliot was then recalled by the plaintiff, and his testimony tended to show that the papers were wrapped in the Globe office, and several hundreds sent to Pickford's place of business. Pickford suggested that witness mail them, and furnished a list of names of addressees. That he sent the "proof" of the article brought by Mackey, after he had remodeled it, to Pickford. Under cross-examination, he said that he told Pickford he would remodel the Mackey article and send him the proof. Walter was present when Pickford paid the money, and furnished part of it. Best recollection was that the papers bundled in the office contained both issues; that is, of December 8 and 15. Other evidence for defendants related to the second article of publication and to facts and circumstances relating to the burned property in Maryland, its value, etc., to the indictment for burning the same, found more than two years thereafter, and to the manner of its prosecution and final dismissal.

Defendant Pickford testified on his own behalf at length. That part of it relating to the publication of the libel is substantially as follows: Shortly after the dismissal of the indictment, Judge Mackey suggested that he would write an article about it, and asked me to come to his office with Mr. Walter and hear what he had written, which we did. I never saw it until it was published in the Globe of December 8th. With this I had nothing whatever to do, and did not hire the boy to go to Rockville. What I wanted was an article stating the proceedings in the police court and Talbott's testimony there. That he had never given either Hopp or Hudson a dollar, but subsequently, when confronted with the fact, confessed that he did give them a check and some money besides. Then I wanted the Grayson matter in the paper, and also a case that happened in Maryland.

I had also heard of a Maryland case in the courts, and got someone to look it up, and another case in Maryland where some man was arrested for murder, and it was supposed that he paid Talbott money to be released. Up to December 8th I had never seen Elliot. Between that date and the 15th Bradshaw wrote an article, which I did not see until Elliot sent for me. I went down with Mr. Walter, approved of the article, and agreed to take 1,000 copies, and to pay 5 cents apiece for them. This is the only money I ever paid Elliot.

I took a lot of the copies of the paper of December 15th, and gave them to my Maryland customers when they came in. I did not send them any by mail. After my interview with Mr. Elliot I never saw him from that day to this, until he appeared in court. I did not request him to appear as a witness in my behalf in this trial.

Cross-examined, he· said: "Judge Mackey wrote the article shortly afterwards, without any request from me. He told me he made as much money writing for magazines as he did as an attorney, and was going to write up this case in the interests of justice. I did not pay him a cent for it. He read a part of it to me, but not as it appeared in the Globe. I could not recognize the article in the paper of December 8th as Judge Mackey's. All that I remember of it is that it contained the police court proceedings. He told me he would have it published in the Post, but said nothing whatever about the Globe until afterwards. I was never at Mr. Elliot's office but once, and then after the publication of December 8th. My object in publishing the article of December 15th was to get before the people of Montgomery county and my customers something that would show all the proceedings that happened in court, and that we could substantiate in every particular. I wanted all those things brought before the public.

"After it was published Bradshaw met me and said: 'That is not right at all,' and went off. I never saw his article until I saw it in Elliot's office. I did not see the proof of the article. Elliot read it over to me, and told me he would make some changes to make it more readable. He is mistaken in saying

that I paid anything for the first article, for I did not. Judge Mackey's article as he read it to me consisted of court proceedings, and was backed up by evidence."

Defendant John H. Walter testified as follows:

"About the 1st of December, 1901, Pickford told me that Judge Mackey was going to write an article in the Rockville case, and asked me to go with him to Judge Mackey's office to hear what he had written. The judge read something which he said he was going to publish in the papers. This is about all I know of the article.

"Subsequently Bradshaw informed me he was going to write an article. I knew he was accustomed to writing articles for the daily papers, and especially articles on local politics; and Mr. Pickford one day asked me to go with him to the office of the Globe, the editor having asked that we appear there, and wanting to read some article to us. He read the article over, and we agreed that if it was printed in his paper we would take 1,000 copies and pay 5 cents apiece for them. The article seemed to be pretty good and to embody the facts. We paid for the papers, and quite a number of them were distributed. Five or six hundred of our thousand copies were never distributed. I had nothing whatever to do with the article of December 8th."

*Mr. Henry E. Davis, Mr. Samuel Maddox,* and *Mr. H. Prescott Gatley* for the appellants.

*Mr. Andrew A. Lipscomb, Mr. Wm. M. Ellison,* and *Mr. John Ridout* for the appellee.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

But two exceptions were taken by the appellants during the trial, and only so much of the evidence recited at length in the bill of exceptions has been set out in the preliminary statement as is necessary to the elucidation of the questions raised by the assignment of errors.

The plaintiff, having testified briefly on his own behalf in support of the formal allegations of his declaration, was examined, without objection, on some matters relating to his investigation of the burning of the house in Maryland, for which the defendants had been indicted. The court of its own motion interrupted the examination, making this statement to counsel for defendants: "On what line are you pursuing this inquiry?" Counsel replied: "I am going to show, if I can, the absence of good faith in this indictment on the part of the district attorney" (meaning plaintiff). After some discussion the court said: "I think I have heard enough to know what your proposition is. I cannot see but that it is an attempt to prove the truth without pleading it. * * * You may prove anything Pickford heard the witness say before the article was published." Defendants' counsel: "I want to prove by this witness, first by his own testimony in connection with the transaction complained of, that he is not the man of good character that he says he is." Plaintiff's counsel interposed to say that he did not object. Defendants' counsel, continuing, said: "Secondly, I want to show that Mr. Pickford, from what he heard the plaintiff say, had reasonable grounds to believe that he was mixed up in some way with this conspiracy." The court: "You may prove anything Pickford heard the witness say before the article was published." Counsel for defendants: "I understand the court will not let me go into the inquiry as to whether or not the plaintiff knew the man Hudson before he made this presentment to the grand jury, and whether he investigated the character of the man." The Court: "Under your statement that you propose by that line of testimony to prove that the district attorney acted in bad faith, I will not hear it because I do not think it is relevant for that purpose." Counsel for defendants noted an exception, and the first assignment of error is founded thereon.

It does not appear from the foregoing recital what particular questions were intended to be propounded to the plaintiff, but it is contended that the intent was to show the plaintiff's bad character. Many authorities hold, and, as stated in 2 Greenl. Ev. sec. 424: "It seems well settled that the defendant may im-

peach the plaintiff's character by general evidence in order to reduce the amount of damages," under the general issue. Some hold, also, that where the plaintiff has been charged with being a person of criminal or vicious practices, evidence of the commission of particular acts of the kind charged, or of bad reputation in regard thereto, is also admissible. These questions are not involved, because no such evidence was intended to be elicited from the plaintiff. The court understood what counsel first expressly stated, that the attempt was to show bad faith in the plaintiff, as State's attorney, in procuring the indictment of defendants for arson, and in conducting the prosecution. In other words, he regarded it as an attempt to prove the truth of the published words without a plea of justification. In this view he was clearly right in excluding the inquiry. It is a well-settled rule that evidence tending to show the truth of the alleged libelous words is inadmissible, under the general issue, either in bar of action or in mitigation of damages. 2 Greenl. Ev. secs. 424, 425; Townshend, Slander and Libel, sec. 409.

The court was apparently correct in his understanding of the proposed line of inquiry; but if mistaken it was the duty of counsel to correct his misapprehension by a specific statement of the questions they desired to ask, or of the particular facts they proposed to inquire of.

The next assignment of error is on the exception taken to the refusal of the following special instruction asked by the defendants:

"1. The jury is instructed that this action is based solely upon the article printed in the issue of the newspaper known as the Sunday Morning Globe, of December 8, 1901, and that, in order to entitle the plaintiff to recover, the jury must find that the exact language of that article, or such part thereof as the jury under the instructions of the court shall find to be libelous and as are set forth in the declaration, was or were written, or authorized to be written, or published, or authorized to be published, by the defendants, or one of them; and its verdict in any case can be against only such one, if either, of the defendants as is shown by the evidence so to have written or published, or

authorized the writing or publishing, of the same. And in considering whether the defendants, or either of them, authorized the publishing of the said article, or any such part thereof, as set forth in the declaration, it will not be sufficient to find from the evidence only that the defendants, or either of them, had knowledge, in advance of the publication of the said article, that it was to be published and expected its publication; the jury must find from the evidence that the defendants, or one of them, authorized, directed, or participated in the publication."

The charge given by the court relating to this point is in the following language:

"Therefore this article on the face of it, as a matter of law, is libelous, and its meaning libeled this plaintiff. The question for you to decide is whether these defendants have done it, or whether somebody else has done it. There are two theories upon which the plaintiff submits to you the proposition that the defendants have libeled him. The first is predicated upon the testimony of Mr. Elliot, who gave testimony tending to show that the defendants procured him to publish this article after they knew what was in it, about the plaintiff; that the defendants had procured him to publish this article, knowing what it contained with respect to the plaintiff, Mr. Talbott. If they did, it is immaterial whether they wrote it or not. If they knew what this article was going to be in advance, as the testimony of Mr. Elliot indicates, if they procured him to publish the article in so far as it referred to Talbott, then they are liable for it, although they did not write it themselves. But if, when you consider Elliot's testimony, opposed, as it is, by the testimony of the defendants, and perhaps other witnesses, you conclude that the fact of that matter was that these defendants, and neither of them, did in person go to Elliot's office before the publication of the article of December 8th, and that neither of them did actually procure him to publish that article before he published it, in respect of its allegations as to Talbott, then in that regard they are not responsible for the publication on that theory as submitted by the plaintiff.

"Then you would have to proceed to consider whether or not,

after Elliot had printed the article in his paper, they secured that particular paper and gave it circulation; because the publication of an article which on its face is a libel injures the good name of the individual libeled, independent of who wrote it. So that, inasmuch as this article is on its face a libel, if the defendants, or either of them, secured copies of the paper after it was published, and themselves put it in circulation after it was published, then they would be responsible for it the same as if they had written it themselves. But if not, then they would not be responsible at all for this libel, unless it be upon the other theory the plaintiff submits, which is as follows: That, although they did not write the article themselves, that although the jury may find they did not go to Elliot's and get Elliot to print the article, that nevertheless they procured Judge Mackey to write the article, and that they are responsible for it on that account.

"That depends entirely upon whether Judge Mackey wrote an article on his own account and carried it to Elliot for publication on his own account, or whether he wrote an article and carried it to Elliot, as the mere conveyance, from these defendants. It is not necessary that they should have said to Judge Mackey, in express words, 'You write an article, this article, and you carry this to Elliot and get him to put it in the paper for us;' but it is necessary for you to find from the evidence, before you can hold them responsible for anything that Judge Mackey did, that they, either directly or by implication, made him their medium for the purpose of transmission to Elliot for publication of the article. If you find that they knew Judge Mackey was about to take an article to Elliot, that is not sufficient. They did not have to stop him. It is necessary, as I have said, that you draw the distinction, and ascertain whether the article carried by Mackey was his own article, taken of his own volition, or whether it was an article carried to Elliot by Judge Mackey as the mere conveyance from them of their plan and purposes, as distinct from Judge Mackey's plan and purposes. If you find that he was their agent in that regard, then they are responsible for what he wrote upon this subject, to the extent that they

authorized him to write.    If he was their agent for the purpose
of writing the article, it is not necessary that they shall have
said to him, in order to be responsible for his language, 'Write
this, that, and the other thing,' in so many words.    But it is
necessary that they, either directly or by implication, authorized
him to write, under such a general authority as fairly carried
with it the authority to express on their behalf what the article
contains.    If so, they would be responsible for what he wrote
in that regard.    Otherwise, not.

"There, however, you have to make another inquiry, as
follows: Even if you find that they did authorize Mackey to
carry to Elliot for publication an article, they are not yet re-
sponsible for this article unless you find this is the article that
they fairly authorized him to carry.    That is to say, inasmuch
as the libel of this article respecting Talbott grows out of what
this article says about Talbott—not about somebody else—you
will have to find, before you can hold them for what Judge
Mackey did, that Judge Mackey was their agent for the pur-
pose not only of writing the article, but was their agent for
the purpose of writing substantially about Talbott what this
article says about Talbott; because, in so far as this article men-
tions Talbott in a way that injures his name as a lawyer and
official, if you find that those parts of this article were written
by Elliot, and not by Judge Mackey, and yet you find that Judge
Mackey was authorized by these defendants to write the balance
of the article so far as it did not defame Talbott, then they
would not be responsible for the part of it that did defame
Talbott.    That is the last question of fact that occurs to me
which you will have to decide in determining that second phase
of it that the plaintiff submits to you for your determination.

"If you find that, in either of the aspects under which the case
goes to you, the defendants are responsible for so much of the
article as injures the good name of Talbott as an officer and a
lawyer, then, inasmuch as the article on its face is a libel, if they
are responsible for that part of it that libels Talbott, because
they, either directly or by implication, occasioned the publica-
tion of it, then the plaintiff has proved a right to recover, and

you would be concerned in ascertaining what the rules of law are concerning the measure of his damages."

In our opinion this charge, no part of which was excepted to, clearly and fairly stated the law applicable to the several phases of the evidence offered by both parties, relating to the publication of the so-called Mackey article on December 8, 1901, to which publication alone the consideration of the jury was, at the request of the defendants, expressly confined. As it embodied all that was contained in the refused instruction, the denial of the latter was not error.

The judgment will therefore be affirmed, with costs.

*Affirmed.*